# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

NOV 1 9 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EFRAIN CHAVEZ<br>aka "Chino"<br><br>Defendant. | Case No. **ED19-0621M** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about January 18, 2019, in the County of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distribution of Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Sonny L. Villareal, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/19/19

_____
*Judge's signature*

City and state: Riverside, California

Hon. KENLY KIYA KATO, U.S. Magistrate Judge
*Printed name and title*

AUSA: Eli A. Alcaraz (951-276-6938)

## AFFIDAVIT

I, Sonny L. Villareal, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Efrain CHAVEZ ("CHAVEZ"), also known by the moniker "Chino," for violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii):  Distribution of Methamphetamine.

2.    The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are provided in substance and in part only.

### II. BACKGROUND OF AFFIANT

3.    I am a Special Agent ("SA") with the Department of Homeland Security, Immigration and Customs Enforcement/Homeland Security Investigations ("HSI") and have been since April 2016. I am presently assigned to the HSI Office of the Assistant Special Agent in Charge, San Bernardino, California, Gang Investigation Group.

4.    Before becoming an HSI SA, I worked for the United States Customs and Border Protection as a Border Patrol Agent

("BPA") from December 2006 until April 2016. As a BPA, I primarily focused on investigating violations of the Immigration and Nationality Act, serving as a Canine Handler, and serving as an Intelligence Agent. I also had many overlapping responsibilities with my current role, as described in the following paragraphs in this Section.

5. As an HSI SA, I have received basic law enforcement training from the Federal Law Enforcement Training Center. Specifically, I have received training to enforce Titles 8, 18, 19, and 21 of the United States Code. I have received approximately 12 months of training and have investigative experience concerning drug identification and interdiction, gangs, weapon offenses, investigative techniques, evidence processing, immigration offenses, traffic enforcement, property crimes, personal crimes, interviewing and interrogation, dignitary protection, identify theft, fraud and forgery detection, false document detection, fugitive arrest operations, federal criminal prosecution, the Spanish language, drug and alcohol influence recognition, and general patrol officer techniques and tactics.

6. During my career as a law enforcement officer, I have initiated and participated in criminal investigations of individuals and organizations for violations of state and federal law. I interviewed numerous subjects and witnesses whose testimony has led to the arrest, indictment, and conviction of individuals for violating state and federal law.

I am familiar with the federal procedures involved in the execution of federal search warrants.

7.   As noted, I am assigned to the Gang Investigation Group.  Specifically, I am currently a member of an HSI-led Gang Impact Team ("GIT"), a multi-agency task force investigating violent criminal street gang activities in Riverside County, California.  This task force is composed of sworn law enforcement personnel from HSI, Riverside County District Attorney's Office ("Riverside DA"), the United States Border Patrol ("Border Patrol"), the Beaumont Police Department, the Banning Police Department, Cathedral City Police Department, the Corona Police Department, the Desert Hot Springs Police Department, the Hemet Police Department ("Hemet PD"), the Palm Springs Police Department ("Palm Springs PD"), California Department of Corrections and Rehabilitation, and Immigration and Customs Enforcement.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.   CHAVEZ sold methamphetamine to a confidential informant ("CI2")[1] on five occasions between January 18, 2019 and July 10, 2019, totaling approximately 2.99 kilograms of methamphetamine.  During the first controlled purchase, on

---

[1] CI2 assists law enforcement for monetary compensation. CI2 has a felony conviction for Assault with Intent to Injure in February of 2010.  CI2 has also been arrested for Possession of a Synthetic Narcotic with Intent to Sell.  Law enforcement has relied on information provided by CI2 and CI2 has proven reliable.

January 18, 2019, two CIs were used, with CI1[2] introducing CI2 to CHAVEZ. During the fifth controlled purchase, on July 10, 2019, CHAVEZ sold methamphetamine to an undercover law enforcement officer ("UC") and CI2.

## IV. STATEMENT OF PROBABLE CAUSE

### A.   The Controlled Purchases of Methamphetamine

9.    I learned the following from reviewing reports of investigation and from conversations with involved officers.

#### 1.   The January 18, 2019 Purchase

10.   On January 18, 2019, at approximately 12:55 p.m., Palm Springs PD Detective Mitchell Sulak, Riverside DA Investigator Ryan Monis, and Riverside DA Supervising Investigator Chuck Cervello met with CI1 and CI2 at a pre-determined location. CI1 arrived at the location and Detective Sulak searched CI1's car and CI1's person. Detective Sulak did not find any contraband or other things that could compromise the investigation in the car or on CI1. Detective Sulak also searched CI2. Again, Detective Sulak did not find contraband on CI2.

11.   Later that same day, at approximately 1:15 p.m., Detective Sulak handed CI2 $1,100 from task force funds. At approximately 1:31 p.m., Detective Sulak turned on audio video recording devices on CI1 and CI2 in order to monitor and record the upcoming transaction with CHAVEZ. The devices were given to

---

[2] CI1 assists law enforcement for monetary compensation. CI1 has a felony conviction for Possession of Narcotics with Intent to Sell in May of 2008 and Narcotic Attic or Felon with a Firearm in December of 2007. CI1 has also been arrested for Possession with Intent to Sell or Distribute. Law enforcement has relied on information provided by CI1 and CI1 has proven reliable.

CI1.  CI1 placed a phone call to (760) 713-9895 (the number known to law enforcement to belong to CHAVEZ, "CHAVEZ's Number").  A male voice answered the phone; Detective Sulak, who is familiar with CHAVEZ's voice from prior interactions, recognized the male voice as being CHAVEZ's.  CHAVEZ told CI1 to meet at the Food 4 Less in Cathedral City in fifteen minutes.

12.  The Food 4 Less is located at 34251 Date Palm Drive, Cathedral City, California 92234.  At approximately 1:34 p.m., CI1 and CI2 left the location where they had met with law enforcement and were followed by Investigator Monis to the Food 4 Less.  GIT team members were already in the Food 4 Less parking lot awaiting the arrival of CI1, CI2, and CHAVEZ.  At approximately 1:44 p.m., the CIs arrived at Food 4 Less and parked in the parking lot.  At approximately 1:46 p.m., CI1 called CHAVEZ and told him that CI1 was at the Food 4 Less parking lot.  CHAVEZ said that he was on the way.

13.  Later, at approximately 2:07 p.m., CHAVEZ called CI1's telephone and asked CI1 where CI1 was.  CI1 told CHAVEZ that CI1 was in the parking lot and provided a description to CHAVEZ of the car CI1 took to the Food 4 Less.  Shortly after the call, CHAVEZ arrived at the Food 4 Less in a black Dodge Ram (unknown plates) and parked next to CI1's car.

14.  Then, at approximately 2:08 p.m., CHAVEZ got out of his car and approached the passenger side of the car that had the CIs.  CHAVEZ spoke to them through the passenger window.  CI1 introduced CI2 to CHAVEZ and told CHAVEZ that CI2 buys a lot of "shit," which I understand based on context and experience,

refers to narcotics. CI2 handed CHAVEZ $1000 and told CHAVEZ the amount. CHAVEZ replied, "It's $1,100," and CI2 handed CHAVEZ an additional $100. CHAVEZ then handed CI2 the suspected methamphetamine and said, "It's 228 grams, guaranteed shit."

15. Then, at approximately 2:09 p.m., CI2 told CHAVEZ that CI2 would be back in about 10 days and would call CHAVEZ's telephone. CHAVEZ said, "Ok" and told CI1 to give CI2 his phone number. CHAVEZ then returned to his car and left the Food 4 Less. During the transaction, Riverside DA Investigator Robert Kwan and Border Patrol Agent Jose Garcia, who were in the Food 4 Less parking lot and who are familiar with CHAVEZ, were able to positively identify CHAVEZ when he got out of his car and went to the CIs' car's passenger window.

16. Then, at approximately 2:10 p.m., after the deal was completed, the CIs left the Food 4 Less and drove back to the pre-determined meet location. They did not stop anywhere on the way back. At approximately 2:25 p.m., the CIs arrived at the location where Detective Sulak retrieved all the recording equipment and the suspected methamphetamine, and also searched CI1, CI2, and the car. No additional contraband (beside the suspected methamphetamine purchased from CHAVEZ) was located on either CI or in the car. Detective Sulak debriefed with the CIs. The CIs' statements to Detective Sulak matched the GIT team's observations and the audio and video evidence recorded from the recording equipment.

17. The suspected methamphetamine seized was tested by a Drug Enforcement Administration ("DEA") laboratory for analysis.

The results indicated that the substance contained 217 grams of pure methamphetamine with an overall purity of 98 per cent.

　　　　　2.　 The January 30, 2019 Purchase

　　18.　On January 29, 2019, CI2 called CHAVEZ at 760-713-9895 (CHAVEZ'S Number).  CI2 told CHAVEZ who CI2 was and that CI2 had just flown into Sacramento.  The CI2 told CHAVEZ that CI2 would be coming to Palm Springs and needed the "same thing," which, based on my experience and the context, referred to a half pound of methamphetamine, which is how much was agreed to be purchased on January 18, 2019.  CHAVEZ said "Ok" to CI2's request.

　　19.　On January 30, 2019, at approximately 3:00 p.m., CI2 met Investigator Monis and Detective Sulak at a pre-determined location in Palm Springs.  CI2 said that half of a pound of methamphetamine would cost $1,100.  Detective Sulak searched the CI2's person and car for contraband or other things that may compromise the investigation.  Detective Sulak did not find anything.  CI2 said he/she spoke with CHAVEZ earlier in the day and CHAVEZ knew CI2 would be available around 3:30 p.m.  CI2 then called CHAVEZ at 760-713-9895 (CHAVEZ's Number) and told him that CI2 was in the area.  CHAVEZ told CI2 to meet at the same spot as a previous methamphetamine deal, which was the Food 4 Less in Cathedral City.

　　20.　Detective Sulak gave CI2 $1,100 in task force funds to complete the transaction and also audio and video recording devices, in order to monitor and record the transaction.  CI2 left the briefing location to meet with CHAVEZ.  Investigator Monis followed CI2.  CI2 did not stop anywhere on the way to the

7

meeting with CHAVEZ.  At approximately 3:17 p.m., CI2 pulled
into the Food 4 Less parking lot.  CI2 called CHAVEZ's Number
and told him that CI2 was at the Food 4 Less.

21.  Later, at approximately 3:26 p.m., CHAVEZ called CI2
and told CI2 that CHAVEZ was at the location.  CHAVEZ drove over
to CI2's car.  CHAVEZ was driving a newer model white Dodge Ram
pick-up truck with California license plate 41869E2 ("CHAVEZ's
Dodge Ram").  The license plate was entered into a law
enforcement database, which revealed that the Dodge Ram was
registered to a Beltran Eric Victor at 9445 Baldy Mesa Road,
Hesperia, California 92344.  CHAVEZ parked on the passenger side
of CI2's car and got out of his truck.  Border Patrol Agent
Garcia saw CHAVEZ get out of his car and recognized him.  CHAVEZ
was wearing what appeared to be a dark colored shirt, blue
jeans, and brown boots and was carrying a dark colored box in
his hand.  CHAVEZ walked up to the passenger side of CI2's car
and opened the door.

22.  CHAVEZ leaned inside and set what ended up being a
Tupperware box on the front seat of CI2's car.  CHAVEZ then
tapped on it and said, "This is what my customers get right
here," referring to the suspected methamphetamine.  CHAVEZ then
said that the methamphetamine was not like the last time, which
based on the context, was the January 18, 2019 drug deal.  CI2
opened the container and said, "Hell yeah, there is hardly any
shake," which I understand, based on my experience and the
context, referred to loose methamphetamine powder.  CHAVEZ asked
if it was all there, which I understand, based on my experience

and the context, referred to the money for the suspected methamphetamine. CI2 said, "Yes, all $1,100." CI2 and CHAVEZ thanked each other, and CHAVEZ shut the door. CHAVEZ walked inside Food 4 Less while CI2 left the parking lot.

23. CI2 was instructed to follow Investigator Monis to another location to collect the suspected methamphetamine, audio video recording devices, and debrief with Detective Sulak. CI2 did not stop anywhere after leaving Food 4 Less and before arriving at the other location. When CI2 arrived, Detective Sulak took custody of the audio and video equipment and the suspected methamphetamine. Detective Sulak also searched CI2's person and car to ensure no additional contraband was present. There was not. During the debrief, Detective Sulak and CI2 spoke about the transaction with CHAVEZ. CI2's statements to Detective Sulak matched the GIT team's observations and the audio and video evidence recorded from the recording equipment.

24. The suspected methamphetamine seized was tested by a DEA laboratory for analysis. The results indicated that the substance contained 220 grams of pure methamphetamine with an overall purity of 99 per cent.

### 3. The February 8, 2019 Purchase

25. On February 5, 2019, CI2 called CHAVEZ at 760-713-9895 (CHAVEZ's Number). CHAVEZ answered and CI2 told CHAVEZ that he/she is going to be on the way home on Friday and asked if he/she could stop by and see CHAVEZ. CHAVEZ said, "Yes" and CI2 told CHAVEZ that he/she was "gonna need the whole thing," which

I understand, based on experience and the context, referred to one pound of methamphetamine.  CHAVEZ said, "Ok."

26.  On February 8, 2019, at approximately 9:15 a.m., CI2 met Investigator Monis and Detective Sulak at a pre-determined location in Palm Springs.  CI2 said that one pound of methamphetamine would cost $2,200.  While at the location, Detective Sulak searched the CI2's person and car for contraband or other things that may compromise the investigation. Detective Sulak did not find anything.  At approximately 9:33 a.m., Detective Sulak activated audio and video recording devices, in order to monitor and record the transaction.  CI2 called CHAVEZ at 760-713-9895 (CHAVEZ's Number) and told him he/she was approximately 10 minutes from the area.  CHAVEZ told CI2 to meet at the Food 4 Less in Cathedral City.

27.  Detective Sulak then gave CI2 $2,200 in task force funds to complete the transaction and the audio and video recording devices.  CL2 left the briefing location to meet with CHAVEZ.  CI2 did not stop anywhere after leaving the briefing location and before arriving at the Food 4 Less.  Investigator Monis followed CI2 and at approximately 9:46 a.m., CI2 pulled into the Food 4 Less parking lot.  CI2 called CHAVEZ via telephone and said he/she was at the meet location, driving the same car and parked in the same spot.  CHAVEZ said "Ok" and the conversation ended.

28.  Later, at approximately 9:55 a.m., CHAVEZ arrived at the location while driving a newer model white Dodge Ram pick-up truck with California license plate 41869E2 (CHAVEZ's Dodge

Ram).  The license plate was entered into a law enforcement
database, which revealed, again, that the Dodge Ram was
registered to a Beltran Eric Victor at 9445 Baldy Mesa Road,
Hesperia, California 92344.  CHAVEZ parked on the passenger side
of CI2's car, but stayed in his truck for several minutes.  CI2
called CHAVEZ at approximately 10:00 a.m. and told CHAVEZ that
he/she was at the location parked next to him.  CHAVEZ said he
was going to CI2's.

29.  Riverside DA Supervising Investigator Gary Cupersmith
saw CHAVEZ get out of his car and recognized him.  CHAVEZ was
wearing what appeared to be a grey shirt, dark colored shorts,
and carrying a cowboy's football jacket.  CHAVEZ leaned in and
began talking with CI2.  At the time, Detective Sulak was
monitoring the audio recording device and could hear the
conversation between CI2 and CHAVEZ.  CHAVEZ said, "There you go
man," and handed CI2 the package of suspected methamphetamine.
CI2 began discussing prices of narcotics and asked whether the
price would drop if CI2 purchased more from CHAVEZ.  CHAVEZ
stated if CI2 buys three or more pounds, then CHANVEZ could
reduce the price by $200 for each pound.  CHAVEZ further said
that when they send them from "out there," they send them all
"shakey."  "Shakey," which based on my experience and the
context, referred to the loose powder that can be present in
packages of methamphetamine, which can reduce the amount of
useable product received.

30.  CHAVEZ said he would remove the shake from the bags.
CI2 asked if CHAVEZ was getting the bundles of methamphetamine

loose or in packs.  CHAVEZ said, "No, I'm getting them in bundles of ten."  CI2 said that CI2 would come back in three weeks and buy a larger amount of methamphetamine.  CHAVEZ said that would ensure that CHAVEZ gives CI2 something CI2 could work with, which based on my experience and the context, referred to the quality of methamphetamine.

31.  Then, at approximately 10:03 a.m., CI2 was instructed to follow Investigator Monis to another location to collect the suspected methamphetamine, audio video recording devices, and debrief with Detective Sulak.  CI2 did not stop anywhere after leaving Food 4 Less and before arriving at the other location. When CI2 arrived, Detective Sulak took custody of the audio and video equipment and the suspected methamphetamine.  Detective Sulak also searched CI2's person and car to ensure no additional contraband was present.  There was not.  During the debrief, Detective Sulak and CI2 spoke about the transaction with CHAVEZ. CI2's statements to Detective Sulak matched the GIT team's observations and the audio and video evidence recorded from the recording equipment.

32.  The suspected methamphetamine seized was tested by a DEA laboratory for analysis.  The results indicated that the substance contained 437 grams of pure methamphetamine with an overall purity of 98 per cent.

4.  The March 19, 2019 Purchase

33.  On March 18, 2019, CI2 called CHAVEZ and told him that CI2 would be in the area tomorrow.  CHAVEZ asked what CI2 wanted, and CI2 said that he/she wanted a half pound, which

based on experience and context, referred to methamphetamine.
CI2 further said CI2 would get back up and start getting the
whole thing, which based on experience and context, referred to
ordering one pound.  CHAVEZ said, "Ok."

34.   On March 19, 2019, at approximately 2:30 p.m., CI2 met
Investigator Monis and Detective Sulak at a pre-determined
location in Palm Springs.  CI2 said that half of a pound of
methamphetamine would cost $1,100.  While at the location,
Detective Sulak searched the CI2's person and car for contraband
or other things that may compromise the investigation.
Detective Sulak did not find anything.  At approximately 2:33
p.m., Detective Sulak activated audio and video recording
devices, in order to monitor and record the transaction.
Detective Sulak gave CI2 $1,100 in task force funds to complete
the transaction and the audio and video recording devices.  CI2
called CHAVEZ at 760-713-9895 (CHAVEZ's Number) and told him
that CI2 was in the area.  CHAVEZ advised CI2 that he was still
far and to meet at the Pilot gas station located at 6605 N.
Indian Canyon Drive, Palm Springs, California 92240 at 3:00 p.m.

35.   CI2 left the briefing location to meet with CHAVEZ.
Investigator Monis followed CI2.  CI2 did not stop anywhere on
the way to the meeting with CHAVEZ.  At approximately 3:15 p.m.,
CI2 pulled into the Pilot gas station parking lot.  At
approximately 3:55 p.m., CHAVEZ arrived at the location, driving
a maroon colored Infiniti with California license plate 6YXC839.
The license plate was entered into a law enforcement database,
which revealed the Infiniti was registered to CHAVEZ EFRAIN, at

13

1500 E. San Rafael Drive, SPC 148, Palm Springs, California
92262.

36.  CHAVEZ called CI2 via telephone and asked where CI2
was.  CI2 told him that CI2 was by the air pump on the Jack in
the Box/Wendy's side.  CHAVEZ said "Ok" and moved his car to
that area, ultimately parking on the driver side of CI2's car.
CI2 got into the passenger seat of CHAVEZ's car and closed the
door.  CHAVEZ opened up what appeared to be a trap/hiding space
in his car and said, "I've got another two pounds in there."
CHAVEZ showed CI2 the suspected methamphetamine.  CI2 told
CHAVEZ that CI2 would get more funds and could buy more soon.
CI2 got out of CHAVEZ's car and got back into his/her car.

37.  Then, at approximately 3:58 p.m., CI2 was instructed
to follow Detective Sulak to an undisclosed location.  CI2 did
not stop anywhere after leaving the Pilot gas station and before
arriving at the undisclosed location.  When CI2 arrived,
Detective Sulak took custody of the audio and video equipment
and the suspected methamphetamine.  Detective Sulak also
searched CI2's person and car to ensure no additional contraband
was present.  There was not.  During the debrief, Detective
Sulak and CI2 spoke about the transaction with CHAVEZ.  CI2's
statements to Detective Sulak matched the GIT team's
observations and the audio and video evidence recorded from the
recording equipment.

38.  While Detective Sulak met with CI2, other members of
the GIT followed CHAVEZ.  CHAVEZ drove from the Pilot gas
station to the Arco gas station located at 3689 N. Indian Canyon

Drive, Palm Springs, California 92262.  CHAVEZ parked and got
out of the car.  Investigator Kwan observed CHAVEZ wearing a
brown shirt and black hat.  Investigator Kwan was also able to
take several photographs of CHAVEZ and his car.  CHAVEZ
eventually left the Arco gas station and drove and parked at a
trailer park located at 1500 E. San Rafael Drive, Palm Springs,
California 92262.  CHAVEZ got out of the car and walked into
space 148.  This address was listed as CHAVEZ's address when he
has had prior contacts with law enforcement and it is also the
address listed on the California driver's license issued to
CHAVEZ.

39.  The suspected methamphetamine seized was tested by a
DEA laboratory for analysis.  The results indicated that the
substance contained 220 grams of pure methamphetamine with an
overall purity of 99 per cent.

5.  The July 10, 2019 Purchase

40.  On July 3, 2019, CI2 called CHAVEZ at (760) 713-9895
(CHAVEZ's Number).  CHAVEZ answered the phone and CI2 told
CHAVEZ that he/she would be in town on July 9, 2019.  CI2 also
told CHAVEZ that CI2 had enough money for "three," which based
on experience and the context, referred to three pounds of
methamphetamine.  CHAVEZ said "Ok" and that he would call CI2
from a different number in a "little while."

41.  On July 9, 2019, CHAVEZ called CI2 via telephone from
(760) 713-9895 (CHAVEZ's Number).  CHAVEZ asked if CI2 wanted
three of the ones CI2 usually buys, which based on experience
and the context, referred to half pounds of methamphetamine, or

if CI2 wanted whole ones, which based on experience and the
context, referred to full pounds of methamphetamine. CI2 told
CHAVEZ that CI2 had bought an "LB" last time, which based on
experience and the context, referred to a full pound of
methamphetamine. CHAVEZ asked CI2 to help him out and remind
him "how much did I give it to you for?" CI2 said CHAVEZ that
had sold it for "two," which based on experience and the
context, referred to $2,000, but also reminded CHAVEZ that
CHAVEZ had previously told CI2 that he would sell a pound for
$1,800, if CI2 bought three or more pounds.

    42.  CHAVEZ told CI2 that this was a fresh batch and was is
straight from "over there, straight from the batch." CHAVEZ
told CI2 that he can sell each pound for $1,900 because the
prices went up. CI2 agreed to the price. CHAVEZ told CI2 that
CHAVEZ wanted to make sure they are good, in other words, that
the deal would happen, because CHAVEZ did not want to pick them
up, in reference to the packages of methamphetamine, and have
the deal not happen. CI2 told CHAVEZ that the deal was good and
that CI2 would be in town between 10:00 a.m. and 10:30 a.m.

    43.  In order to introduce an undercover officer (UC),
Riverside DA Investigator Jose Guerrero, CI2 was directed by law
enforcement to order an additional pound of methamphetamine. On
July 9, 2019, CI2 called CHAVEZ at (760) 713-9895 (CHAVEZ's
Number). CHAVEZ answered and CI2 told CHAVEZ that CI2's
brother-in-law (the UC) wanted to buy drugs too. CI2 told
CHAVEZ that CI2 and the UC had a total of $7,500 and would like
to buy an additional pound of methamphetamine. CHAVEZ said he

would make a calculation and would call CI2 back.  CHAVEZ called
CI2 back and said he was going to charge CI2 $7,800, but CHAVEZ
would instead just do the $7,600.  CHAVEZ said he had to pay
"this guy to help me move them."  CI2 told CHAVEZ "Ok" and to
get it done, which based on experience and the context, referred
to getting a fourth pound.

44.  On July 9, 2019, CI2 called CHAVEZ at 760-713-9895
(CHAVEZ's Number).  CI2 told CHAVEZ that CI2 had just spoken to
his/her brother-in-law (the UC) and that the two of them would
have enough money to purchase the four pounds.  CHAVEZ said,
"Ok" and told CI2 to meet in the area of the 215 and the I-10
freeways.  CI2 told CHAVEZ that CI2 would call CHAVEZ when they
were in the area.  The phone call then ended.

45.  On July 10, 2019, at approximately 9:00 a.m., CI2 and
the UC met me and Detective Sulak at a pre-determined location
in San Bernardino, California.  CI2 said that the four pounds of
methamphetamine would cost $7,600.  The transaction was schedule
to take place as a Denny's parking lot at 1190 S. Mt. Vernon
Avenue, Colton, California 92324.  While at the location,
Detective Sulak searched the CI2's person and car for contraband
or other things that may compromise the investigation.
Detective Sulak did not find anything.  At 10:37 a.m., Detective
Sulak activated audio and video recording devices, in order to
monitor and record the transaction.  Detective Sulak gave CI2
and the UC $7,600 in task force funds to complete the
transaction and the audio and video recording devices.

46.  CI2 called CHAVEZ at (760) 713-9895 (CHAVEZ's Number)
and told CHAVEZ that they were approximately 1.5 miles away.
CHAVEZ said that he left the Denny's area and moved to the
Walmart parking lot.  CHAVEZ told CI2 that "they were tripping,"
referring to two men who were traveling with CHAVEZ, but in
different cars.  CI2 left the briefing location with the UC to
meet CHAVEZ.  Detective Sulak followed CI2 and the UC in.  At
approximately 10:57 a.m., CI2 pulled into the parking lot of the
meet location.

47.  Before CI2 and the UC arrived, CHAVEZ was observed
arriving in the Denny's parking lot by Investigator Kwan.
CHAVEZ arrived in a Toyota pick-up truck with California license
plate 8AWI365.  The license plate was entered into a law
enforcement database and the database showed that the license
plate was not on file with the California Department of Motor
Vehicles.  When CHAVEZ arrived in the Toyota, a Lexus with
California license plate AB49E19 was driving behind CHAVEZ and
had two Hispanic men in the front seats.  The license plate was
entered into a law enforcement database, which revealed that the
car was registered to Yaquelin Perez at 4442 Riverbend Lane,
Riverside, California 92509.

48.  CHAVEZ initially parked near the Denny's and the Lexus
parked several spaces away.  Investigator Kwan saw CHAVEZ get
out of his car and walk over to the Lexus.  Investigator Kwan
saw CHAVEZ speaking with the two Hispanic men in the Lexus for
several minutes.  CHAVEZ and the two men stayed in the parking
lot for several minutes, but then drove their respective car to

the Walmart area of the parking lot.  CHAVEZ parked on the south side of the parking lot and the Lexus pulled in several spots away.  At that time, several phone calls were still being made between CHAVEZ and CI2 to coordinate meeting and where they were all parked.

49.  Then, at 10:58 a.m., CI2 and the UC arrived at the Walmart area of the parking lot, with CI2 driving and the UC riding in the front passenger seat.  CI2 parked in the same isle as CHAVEZ, but just behind CHAVEZ's car.  CI2 got out of the car and went CHAVEZ's passenger side door.  CHAVEZ asked where the money was and CI2 said it was in CI2's car.  CI2 walked back to CI2's car and returned to CHAVEZ's car with the UC and the money.  CI2 introduced the UC to CHAVEZ as "Jose."  CI2 told CHAVEZ to remember the UC's face.  The UC introduced himself as "Jose," but told CHAVEZ to call him "Guero."

50.  CI2 then handed CHAVEZ $5,700 while CHAVEZ was seated in the driver seat of the car.  CHAVEZ started counting the money.  While CHAVEZ was counting the initial money given to him, the UC retrieved $1,900 in cash from his pocket and handed it directly to CHAVEZ.  While CHAVEZ continued to count the money he was given by the UC and CI2, CI2 picked up a plastic bag containing the four pounds of suspected methamphetamine. CHAVEZ finished counting the money and said, "Ok cool."  CI2 then told CHAVEZ that if CI2 could not make it in the future, CI2 would send "him," referring to the UC.  CI2 and the UC walked away from the car and CHAVEZ left the parking lot in at approximately 11:02 a.m.

51.   CHAVEZ left the Walmart parking lot, went southbound onto Mt. Vernon Avenue, and pulled into the parking lot of an apartment complex nearby where he met with the two Hispanic men in the Lexus.   The Lexus' passengers got out of the car and walked to CHAVEZ's car.   Hemet PD Detective Dean Benjamin and Investigator Kwan saw CHAVEZ meeting with the two Hispanic men. Detective Benjamin also saw CHAVEZ hand the Hispanic men an object that CHAVEZ retrieved from inside his car.   The two men then left in the Lexus, driving south on the 215 freeway.

52.   At approximately 11:03 a.m., CI2 and the UC left the parking lot and were instructed to follow Investigator Monis to an undisclosed location.   CI2 did not stop anywhere after leaving the Walmart and before arriving at the undisclosed location.   When CI2 and the UC arrived, Detective Sulak took custody of the audio and video equipment and the suspected methamphetamine.   Detective Sulak debriefed CI2 and the UC regarding the transaction with CHAVEZ.

53.   During the debrief, the UC was shown a photograph of CHAVEZ.   The UC identified CHAVEZ as the man who had sold them the four pounds of suspected methamphetamine.

54.   The suspected methamphetamine seized was tested by a DEA laboratory for analysis.   The results indicated that the substance contained 1,789 grams of pure methamphetamine with an overall purity of 100 per cent.

///

///

## V.  <u>CONCLUSION</u>

55.   For all the reasons described above, there is probable cause to believe that CHAVEZ has violated 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii):  Distribution of Methamphetamine.

_____
SONNY L. VILLAREAL, Special
Agent
Homeland Security
Investigations


Subscribed to and sworn before me
this  19  day of November, 2019.

_____
UNITED STATES MAGISTRATE JUDGE

21